**John J. McDONOUGH et al., Plaintiffs-Appellants,**

v.

**CHAMPBURGER CORPORATION et al., Defendants-Appellees.**

**No. 73–1719.**

United States Court of Appeals, Fifth Circuit.

Feb. 1, 1974.

---

James J. Sullivan, Jr., Francis J. DiMento, Manuel Z. Sherman, John J. McDonough, Boston, Mass., for plaintiffs-appellants.

Joe N. Unger, Bernard S. Mandler, Miami Beach, Fla., for defendants-appellees.

Before TUTTLE, DYER and MORGAN, Circuit Judges.

DYER, Circuit Judge:

Minority stockholders of Champburger Corporation, suing in their own behalf and derivatively in behalf of the company, appeal from the district court's final judgment of involuntary dismissal pursuant to Fed.R.Civ.P. 41(b), based upon a failure of proof at the close of plaintiffs' evidence of a prima facie case of a violation of the federal securities laws or the applicable state common law by the defendants. We affirm.

Champburger was incorporated in 1968 to engage in the fast food service business. With the sponsorhip of boxing champion Muhammad Ali, the goal was to establish black owned and operated franchises in black areas. Unfavorable publicity, however, concerning the franchising industry at that time, made lenders reluctant to extend financing to new entrants in the fast food industry, and riots in black areas made it extremely difficult to operate existing franchises in the troubled neighborhoods. By June of 1970, the company had incurred losses of approximately $229,000 for the preceding nineteen months.

In December of 1969, law partners Courshon and Berk were retained to represent Champburger as special counsel. For a short time in January and February of 1970, they served not only as counsel for but directors of the corporation. By May of the same year, however, they had begun to represent a group of dissident stockholders, and Courshon explored the possibility of a reorganization of Champburger which would result in redirecting the company's assets into an entirely different business. Courshon and a few associates had, in 1968, formed Trans Globe Films, Inc. to engage in the business of leasing motion picture films to television stations. As of 1970, Trans Globe was still a dormant corporation which had no assets other than a few licensing agreements of nominal value. It had no history of operations, and, in fact, had no place of business other than Courshon's law office. In sum, Trans Globe had an idea, but no funds with which to implement it. By contrast, Champburger's corporate purpose appeared to be leading the company toward financial disaster, although the balance sheet of November, 1969, showed assets of several hundred thousand dollars.

At Champburger's annual stockholders' meeting on June 12, 1970, it became apparent that the incumbent management was going to be ousted. The meeting was adjourned until June 18, at which time four of the company's five directors were replaced. The proxies of the dissident stockholders were voted by Berk. Three of the new directors, Spring, Salstein, and Keats, were clients of Courshon and Berk who had been requested by Courshon or another Trans Globe officer to serve on the Champburger board.

On July 23, 1970, the new Board adopted a Plan of Reorganization designed to make the Champburger assets available to Trans Globe. In return for all the outstanding shares of the Trans Globe stockholders, approximately 31% of Champburger's stock was transferred pursuant to an escrow agreement. The agreement provided that shares of Champburger would gradually be released from escrow and delivered to Trans Globe stockholders under a formula based upon Trans Globe's ability to generate earnings. While the Champburger stock was in escrow, however, the agreement gave Courshon power to vote the shares as the voting trustee. When the escrowed stock was added to that which Courshon personally owned, he had voting control of 50.7% of the outstanding stock of Champburger.

On August 3, 1970, Champburger mailed a proxy solicitation to the company's stockholders and recommended approval of the proposed reorganization. Although the Plan was approved by a majority of the stockholders, the company eventually failed.

Two Champburger stockholders, appellants McDonough and Clifford,[1] not only disapproved the reorganization as an ill-advised business proposition, but now urge that it was a scheme to defraud the company and its stockholders. The thrust of their attack is that the Plan was a violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and specifically of Rule 10b–5.[2] It is not disputed that the exchange of the Champburger stock for that of Trans Globe was a purchase and sale of securities within the meaning of § 10(b). S.E.C. v. National Securities, Inc., 1969, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668. McDonough's contention that the reorganization was a fraudulent scheme which violated the express prohibitions of Rule 10b–5(a) and (c) is best summarized by the following excerpt from his brief:

. . . Champburger was duped into parting with 375,000 shares of its stock,, shares which represented voting control over a corporation with assets worth many hundreds of thousands of dollars, for nothing in return, with the possible exception of a wild, ephemeral dream. * * *

Ordinarily, property owners do not part with their valuables without re-

ceiving something of equal value in return, unless they are victims of some type of fraud.

This broadside attack is better understood by examining some of the specific allegations that the proxy solicitation violated Rule 10b–5(b) because of untrue statements and omissions of material fact.[3] McDonough's thesis that the reorganization involved a deceptive course of business is grounded largely on an allegedly clandestine and illegitimate relationship between the officers of Champburger and Trans Globe.

■■ Two of the three purportedly false statements[4] and several of the assertedly material omissions raised in this appeal are directed to the alleged failure of the proxy statement to adequately inform the stockholders of the relationship between Courshon and Berk and the newly elected directors of Champburger. The underlying premise is that if the true relationship were known, the shareholders *might* not have given their approval to proposed reorganization. Mills v. Electric Auto-Lite Co., 1970, 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593; Kohn v. American Metal Climax, Inc., 3 Cir. 1972, 458 F.2d

1. Although Clifford is a party in this litigation, she was added as a plaintiff in either the second or third amended complaint, and apparently has taken no active part in the lawsuit. On the other hand, McDonough is an attorney who handled the matter *pro se* until another lawyer entered the case shortly before trial in the district court. To simplify party references, therefore, appellants will hereafter be denominated "McDonough."

2. 17 C.F.R. § 240.10b–5 provides:
    It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
    (a) To employ any device, scheme, or artifice to defraud,
    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the state-

ments made, in the light of the circumstances under which they were made, not misleading, or
    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
    in connection with the purchase or sale of any security.

3. Because the securities were not registered under § 12 of the 1934 Act, 15 U.S.C.A. § 78*l*, the proxy statement is not subject to the more specific regulation of § 14 of the Act, 15 U.S.C.A. § 78n.

4. We dismiss as unmeritorious the contention that the Plan which gave Courshon voting control of the corporation and thereby the power to sell all the company's assets was the equivalent of a sale requiring stockholder approval. The proxy solicitation statement that the reorganization did not require stockholder approval was, therefore, not false.

255, 269; S.E.C. v. Texas Gulf Sulphur Co., 2 Cir. 1968, 401 F.2d 833, 849. The two allegedly false statements stem from a single sentence in the proxy statement: "For a brief period of time during January and February, 1970, Messrs. Courshon and Berk were Directors of the Corporation and the firm of Courshon and Berk represented the Corporation." At the trial, McDonough proffered a document which suggested that Courshon was on the Champburger board as late as April of 1970. The evidence also indicated that his law firm had given legal advice to the company in two matters in July or August of 1970. Although we entertain serious doubt that such a showing would be sufficient to demonstrate the untruthfulness of the statements, we are convinced that even if the information is assumed to be false, it is so insignificant, in view of the totality of the transaction as represented by the proxy materials, that there is no reasonable possibility that the judgment of the stockholders might have been affected.

A failure to meet the materiality test is also fatal to each of the alleged omissions suggested by McDonough concerning the relationship between the Champburger and Trans Globe principals. It is asserted that the proxy material was incomplete because it did not indicate that Berk represented the dissident stockholders at the meetings of June 12 and June 18. Another charge is that the statement, "Roger Spring, Robert Salstein and Richard Keats are all clients of the Law Firm of Courshon and Berk and these three individuals are members and comprise a majority of the Board of Directors of the Corporation," was insufficient since it failed to disclose (1) that the three had been asked by Courshon and another Trans Globe official if they would be willing to serve on the board, and (2) that Berk cast the proxies which elected them to office. It is claimed that the management was remiss in failing to report that as early as May of 1970, Courshon had discussed the possible acquisition of Trans Globe by Champburger. Finally, McDonough contends that the proxy material was deficient for not revealing the "conflict of interest" of the directors who commended the Plan to the stockholders.

■ After having carefully studied the proxy statement, as well as the entire record of the trial in the district court, we are convinced that any reasonable stockholder would be adequately apprised of the close working relationship between the Trans Globe interests and the new management of Champburger. There is no allegation or proof of any financial relationship between the nominees sponsored by Courshon and Trans Globe, and we are unwilling to hold that sponsorship alone is of such significance that it must be disclosed in a proxy statement. We are, therefore, wholly unpersuaded that any of the "omissions" concerning the relationship of the Trans Globe officers to the Champburger directors might have misled the stockholders in violation of Rule 10b–5(b).

■■ Having disposed of the contention that the relationship of the parties who devised and recommended the reorganization was inadequately disclosed, we now must determine whether the Plan was anything other than a good faith, albeit unsuccessful, attempt to save a troubled enterprise. It is true that Champburger gave up control of rapidly diminishing but still substantial assets for little more than a potentially viable business concept. As the district court observed:

There may appear to be something rather unusual about this particular merger when you look at the proxy statement. Trans-Globe is held out as having contract rights of nominal value, that it has no assets, no history or operations, no income and no earnings. It is hardly a situation where Champburger was beguiled or any of its stockholders were beguiled into voting for a merger with Trans-Globe.

We agree that stockholder approval of the Plan resulted not from beguilement, but probably from desperation. Apparently the Champburger stockholders, fully aware of the one-sidedness of a deal requiring them to relinquish the use of their assets to a company with no business record, were willing to assume such an extreme risk to avert imminent financial disaster. Under these circumstances, we cannot say that the other information McDonough claims was wrongfully omitted was material. Certainly the details of the licensing agreements could not have been significant since it is undisputed that the contracts were of but nominal value. Even the absence of the last audited balance sheet was not, in this situation, a material omission. We recognize that the Seventh Circuit in Swanson v. American Consumer Industries, Inc., 7 Cir. 1969, 415 F.2d 1326, held that the absence of a balance sheet was one of several omissions which made a proxy statement materially misleading. In the case *sub judice*, however, the proxy materials noted that Champburger was operating three restaurants, that a fourth was virtually completed, and that the company had approximately $150,000 in cash in its treasury. Since it was clear that the stockholders were asked to give up control of their corporation's substantial assets to an enterprise with almost none, the absence of a detailed financial statement was not a material omission. We are firmly of the view that there has been no showing of a violation of § 10(b) or of Rule 10b-5.

Nothing in the record supports the assertion of a breach of the Champburger directors' fiduciary duties. Finally, there is not a scintilla of evidence of a civil conspiracy. Because neither the reorganization nor the proxy solicitation violated any law, we do not reach the question of damages or the propriety of refusing to permit the suit to be maintained as a class action.

Affirmed.