George WASSON, Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

No. 76–1665.

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1977.

Decided June 21, 1977.

Rehearing and Rehearing En Banc Denied Sept. 30, 1977.

Ronald R. Fletcher, Minneapolis, Minn., for petitioner.

David Ferber, Securities & Exchange Commission, Washington, D. C., for respondent.

Before HEANEY, ROSS and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

George Wasson petitions this Court, pursuant to § 25(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78y(a)(1), to review an order of the Securities and Exchange Commission suspending him from associating with any broker or dealer for a period of forty-five days. The order was based upon the Commission's determination that Wasson willfully violated and willfully aided and abetted violations of §§ 5(a)[1] and

---

1. Section 5(a) of the Securities Act of 1933 reads as follows:

§ 77e. *Prohibitions relating to interstate commerce and the mails*

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

882

(c) [2] of the Securities Act of 1933, 15 U.S.C. § 77e(a) and (c), in connection with the sale of S & M Industries, Inc. (S & M) common stock. We affirm that portion of the order finding violations of § 5(a)(1) and § 5(c) and reverse the remainder.

On September 16, 1970, the Commission issued an order for private proceedings against twenty-eight respondents, including Wasson. In particular, he was charged with participating in the sale of a substantial block of unregistered S & M common stock. That transaction was initiated by Kenneth Roth, a Miami resident and an officer of S & M, who employed Richard Mackay, a Texas attorney, to arrange an exchange of some of Roth's S & M shares for automobiles from a Minneapolis dealership. Mackay, in turn, contacted Howard Davidson, a Minneapolis resident, and asked him to locate an interested automobile dealer. Samuel Proman, general manager of a Minneapolis automobile dealership, expressed some interest in the exchange and on April 14, 1969, called Wasson to inquire about the price of S & M stock. At Proman's request, Wasson followed the stock's listings for about a week and reported to Proman periodically.

Soon thereafter, Proman agreed to exchange seven automobiles for 30,000 shares of S & M stock. Title to the automobiles was to be placed in the names of seven outstate residents. Arrangements were made for Wasson to sell the stock because Proman wanted the proceeds immediately. The share certificates were delivered from Miami, on April 22, and the parties decided that Davidson would take the shares in his name as he was the only person known in Minneapolis. The shares were to be transferred directly to the automobile dealership; but when Proman brought the certificates to Wasson for sale, he was told that the dealership had no account. They agreed to sell the shares in Davidson's name.

On April 24, Wasson opened an account in Davidson's name and prepared an agreement assigning the proceeds to the automobile dealership. During this meeting, Wasson informed his superiors at Walston and Company of the contemplated transaction; and based on this information, they commenced an investigation of the securities' transferability. Subsequently, the securities were sold on the open market.

After two days of hearings, the Administrative Law Judge concluded that Wasson violated §§ 5(a) and 5(c) of the Act by participating in the sale of unregistered securities. In particular, Wasson was sanctioned for failing to discover, when a simple inquiry of Davidson would have revealed, that the S & M shares were owned by a control person, and for failing to disclose to his superiors certain critical factors regarding the transaction which would have caused greater caution in their investigation. In detailing the undisclosed facts which suggested the questionable nature of the transaction, the Administrative Law Judge stated:

> What none of these persons [Mr. Wasson's superiors] knew, but Mr. Wasson did know, was that Davidson was not the owner of the shares, the Lincoln automobiles were to be received by several persons other than Davidson, who was acting for Mackey [sic] and Roth, among others, and that the assignment of funds by Davidson to Prestige was in part designed to permit the delivery of the cars prior to settlement date.

Wasson's failure to investigate and reveal completely his knowledge of the transaction formed the basis for the Administrative Law Judge's decision that he sold unregistered securities. The Commission sustained the findings of the Administrative Law Judge, but reduced the sanction imposed.

**2.** Section 5(c) of the 1933 Act provides:

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

In his appeal of the Commission's order, Wasson raises the following issues: (1) that he was deprived of due process by the Commission's misstatement, in its Order of Proceedings, of the transaction out of which the charge arose, (2) that he was effectively· denied the right to cross-examine adverse witnesses, (3) that the Commission's order lacked findings and reasons sufficient to support its determination that Wasson violated the Securities Act of 1933, (4) that the Commission's determination that Wasson sold or offered to sell unregistered securities was not supported by substantial evidence, and (5) that Wasson's conduct was not willful as a matter of law. Our consideration of each issue follows.

## I. The Notice Issue.

In its Order of Proceedings, the Commission mistakenly charged Wasson with violating the Securities Act in connection with the sale of 23,000 shares of S & M stock. On the second day of hearings before the Administrative Law Judge, the Order was amended to reflect the actual number of shares (30,000) involved in the Davidson transaction. Wasson was not present at the second day of hearings and no attempt was made to notify him of the amendment. The 23,000 figure refers to a block of shares which were provided to Walston and Company in partial substitution for the Davidson shares once Walston determined that the latter were not freely transferable.

In substance, Wasson argues that he relied on the original Order and was not aware that the Davidson transaction was the subject of the Commission's investigation and hearing. He claims this misunderstanding prevented him from adequately preparing his defense to the transaction for which he was sanctioned. There are several flaws in this argument. First, if, in fact, Wasson believed that the Commission was only investigating the 23,000-share transaction, he must also have assumed that no possible charge could be brought against him since he was not involved in the receipt or sale of the substitute shares. However, the original Order clearly indicated that Wasson and others were charged with willfully· violating the Securities Act and ordered them to respond to those charges. He never objected to these charges which leads us to believe that he realized which transaction was involved. More importantly, there is considerable evidence, both from his testimony at the hearings [3] and from his previous correspondence with the Commission,[4] that Wasson was not misled and, in

3. The transcript of the hearing before the Administrative Law Judge, at which Mr. Wasson appeared and testified, establishes that the transaction under consideration was the Davidson transaction. For example, at the beginning of the hearing on April 11, 1972, the staff member handling the case stated:

> The Division's evidence will show that the respondents Biersach and Wasson participated in the opening of an account at the Minneapolis office of Walston & Company in late April 1966 for one Howard Davidson who wished to sell a block of 30,000 shares of S & M Industries, Inc. common stock and they failed to make diligent inquiry of Davidson and others concerning the source of the stock, how and why it was acquired by Mr. Davidson and the consideration given by Davidson for the stock.

Also, when the Administrative Law Judge expressed some concern that the order for proceedings referred to 23,000 shares and the testimony had related to a transaction involving 30,000 shares, staff counsel replied that the staff's allegations against Mr. Wasson involved the 30,000-share transaction. Mr. Wasson immediately confirmed his understanding that this was the transaction in issue by stating: "It is 30,000." The Administrative Law Judge suggested that an amendment to the Order for Proceedings would alleviate the confusion. That amendment was made at the start of the hearing the next day.

Finally, when Wasson was permitted to make a statement in his own behalf at the close of cross-examination, his explanation referred specifically to the 30,000-share transaction:

> The Witness: I would like to say before one share of stock was ever sold, that 30,000 shares were delivered to the Minneapolis office of Walston and Company.

4. The Commission's letter of September 16, 1970, transmitting the Order for Proceedings to Wasson, warned that if he failed to file an answer or appear at the hearing, the matter could be determined against him based on the allegations in the Order. Also, Wasson stated in a letter to the Commission, dated October 6, 1970, respecting the charges in the original Order that his letter was "in answer to selling 30,000 shares ·of S & M Industries for the account of Howard R. Davidson."

884

fact, fully understood the charges brought against him.

## II. The Right to Cross-Examine Adverse Witnesses.

Because Wasson appeared *pro se*, the Administrative Law Judge informed him of his right to counsel, his right to refuse to incriminate himself, his right to produce evidence, and his right to testify in his own behalf. He was not told that he had the right to cross-examine adverse witnesses. Under Rule 14(a) of the Commission's Rules of Practice [5] and § 7 of the Administrative Procedures Act,[6] parties are entitled "to conduct such cross-examination as may be required for a full and true disclosure of the facts." Wasson argues that his right to cross-examine was implicitly denied by the Administrative Law Judge's failure to include it among the rights explained.

■ As a general rule, we believe parties appearing *pro se* in administrative proceedings should be advised of all pertinent rights to which they are entitled. In this case, Wasson should have been informed of his right to cross-examine adverse witnesses. Nevertheless, we do not think Wasson's suspension should be reversed because of the Administrative Law Judge's failure in this regard. In presenting this argument, Wasson identifies no ways in which the failure prejudiced him and no instances where the opportunity to cross-examine might have helped his case. Under these circumstances, we believe the error was harmless.

## III. Adequacy of the Commission's Findings.

In its opinion, the Commission sanctioned Wasson for directly violating §§ 5 (a) and (c) of the Securities Act of 1933 and for aiding and abetting those violations. Wasson claims that the Commission's opinion lacked adequate findings and reasons in support of those determinations.

■ Section 8 of the Administrative Procedures Act, 5 U.S.C. § 557(c)(3)(A), requires that agency adjudications provide findings, conclusions and the reasons or bases therefor on all material issues of fact and law. The purpose for requiring findings of fact is to furnish parties and the reviewing court with a sufficiently clear basis for understanding the premises used by the tribunal in reaching its conclusions of law. *Northeast Broadcasting Inc. v. F. C. C.*, 130 U.S.App.D.C. 278, 400 F.2d 749 (1968). In many cases, the absence of required findings has been fatal to the validity of agency decisions. *Anglo-Canadian Shipping Co. Ltd. v. Federal Maritime Comm'n*, 310 F.2d 606 (9th Cir. 1962). *See Saginaw Broadcasting Co. v. Federal C. Comm'n*, 68 App. D.C. 282, 96 F.2d 554, *cert. denied sub nom. Gross v. Saginaw Broadcasting Co.*, 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391 (1938). However, the standard applied in reviewing agency decisions is not a rigid one. Although findings are required when an agency performs its adjudicatory function, reversing an agency order for failure to abide by this command is inappropriate when the path followed by the agency can be discerned and when its statement is sufficiently precise to permit meaningful judicial review. *Colorado Interstate Gas Co. v. Federal Power Comm'n*, 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945); *Chieppo Bus Company v. United States*, 383 F.Supp. 1192 (D.Conn.1974). *See also Minneapolis & St. Louis Ry. v. United States*, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959); *United States v. Pierce Auto Freight Lines*, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946); Note, *Administrative Findings under Section 8(b)*, 51 Va.L.Rev. 459 (1905). We have no difficulty following the agency's "path" in support of their conclusion that Wasson violated §§ 5(a)(1) and (c). His involvement in the initial stages of the transaction was extensive. Although he did not sell the shares himself, he completely controlled the transaction until his supervisors relieved him and structured the sale arrangement through Davidson's account. These factors,

**5.** 17 C.F.R. § 201.14(a) (1974).

**6.** 5 U.S.C. § 556(d) (1970).

coupled with his failure to question David-son on the source of the stock and his failure to disclose all information to his superiors, led the Commission to find that he willfully sold and willfully aided the sale of unregistered securities.

■ There are no findings or evidence in the record to substantiate a violation of § 5(a)(2). That section prohibits use of the mails to carry a security for the purpose of sale or for delivery after sale. The Commission made no finding that the 30,000 shares of unregistered stock were carried interstate for delivery after sale and a finding of delivery after sale cannot necessarily be inferred from a finding of sale. Thus, we must reverse the Commission's determination that Wasson violated § 5(a)(2).

### IV. Sufficiency of the Evidence to Support the "Sale" Finding.

Wasson contends that since he did not personally execute the sale of the unregistered securities, the finding under § 2(3) of the Securities Act of 1933, 15 U.S.C. § 77b(3), that he sold or offered to sell those securities is without substantial basis in the evidence. He acknowledges that decisions involving violations of § 5 prosecuted under § 12(1) of the 1933 Act[7] may suggest a definition of "sale" which includes participants in a transaction who do not actually contact the ultimate purchaser, but argues that this definition ought not to be applied to violations of § 5 prosecuted under § 15 of the 1934 Act.[8] He reasons that since § 12 has no aider and abettor provision, courts have given a more expansive definition to its "sale" term. Such a broad definition is unnecessary under § 15, he argues, because that provision includes a sanction for aiders and abettors.

Courts considering the "sale" or "offer to sell" in § 12 proceedings have developed two distinct standards for determining whether an individual's actions makes him a seller under § 2(3). The Fifth Circuit adopted a proximate cause test in *Hill York Corp. v. American Int'l Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971). In that case, the Court held

> that the proper test is the one previously forged by the court in *Lennerth v. Mendenhall, supra.* [234 F.Supp. 59 (N.D. Ohio 1964)] " * * * the line of demarcation must be drawn in terms of cause and effect: To borrow a phrase from the law of negligence, did the injury to the plaintiff flow directly and proximately from the actions of this particular defendant?"

*Id.* at 693.

In developing the negligence-related standard, the Fifth Circuit explicitly rejected the broader participation theory followed by the Southern District of New York in *Wonneman v. Stratford Securities Co., Inc.*, CCH Fed.Sec.L.Rep. ¶ 90,923 (S.D.N.Y. 1959). The participation concept would

7. § 77l. *Civil liabilities arising in connection with prospectuses and communications*

Any person who—
(1) offers or sells a security in violation of section 77e of this title * * *
15 U.S.C. § 77l(1).

8. § 78o. *Over-the-counter markets; registration of brokers; information and reports*

(5) The Commission shall, after appropriate notice and opportunity for hearing, by order censure, deny registration to, suspend for a period not exceeding twelve months, or revoke the registration of, any broker or dealer if it finds that such censure, denial, suspension, or revocation is in the public interest and that such broker or dealer, whether prior or subsequent to becoming such, or any person associated with such broker or dealer, whether prior or subsequent to becoming so associated—
* * * * * *
(D) has willfully violated any provision of the Securities Act of 1933, or of the Investment Advisers Act of 1940, or of the Investment Company Act of 1940, or of this chapter, or of any rule or regulation under any of such statutes.
(E) has willfully aided, abetted, counseled, commanded, induced, or procured the violation by any other person of the Securities Act of 1933, or the Investment Advisers Act of 1940[.]
15 U.S.C. § 78o.

hold liable virtually every person who participated in the events leading up to the transaction. In our view, neither theory is wholly satisfactory. The participation theory is too broad in that it extends liability to persons for remote or incidental connection with the transaction. *See Hill York Corp. v. American Int'l Franchises, Inc., supra* at 692. The "sale" term in § 2(3) was meant to be interpreted liberally, *Roe v. United States*, 316 F.2d 617, 620 (5th Cir. 1963); *Creswell-Keith, Inc. v. Willingham*, 264 F.2d 76, 80 (8th Cir. 1959), but not so liberally that all participants in a transaction share liability.

Our difficulty with the Fifth Circuit's proximate cause test is that it fails to elucidate or focus the trier of fact's attention on those policies which the Act was designed to implement and which, in our judgment, ought to be the basis for a "sale" or "offer to sell" determination.

▇▇▇ The Securities Act of 1933 was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). *See* H.R.Rep.No.85, 73rd Cong., 1st Sess., 1–5 (1933). To accomplish this end, registration and disclosure requirements were imposed on those with access to relevant information. The point of sale is a crucial step in the Act's disclosure scheme in that many of the Act's regulatory provisions are triggered by the actor's involvement in a "sale" or "offer to sell." In our judgment, the sale point assumes this importance because in it is the occasion where, at least in theory, relevant information can be obtained from the seller and disclosed to the buyer. Of course, securities transactions as a rule involve various intermediaries between the issuer and ultimate purchaser; identifying a sales point where seller contacts buyer is often impossible. We are not suggesting that a sales point must be identified for each transaction and liability imposed according to each individual's proximity to that point. However, we do believe that one factor which ought to be considered in determining the "sale" or "offer to sell" issue is whether the defendant was uniquely positioned to ask relevant questions, acquire material information, or disclose his findings.

▇▇▇ With this in mind, we begin with Wasson's argument that the sale term of § 5, as prosecuted under § 15, requires that the broker actually execute the sale. We cannot accept this interpretation for several reasons. First, it ignores the way in which brokerage houses function. In that system, the registered representative procures an order, but oftentimes backroom personnel complete the transaction by locating a willing buyer. Thus, the absence of direct contact between a broker and the ultimate purchaser is in no sense determinative of his seller status. *Hill York Corp. v. American Int'l Franchises, Inc., supra*, at 692. More importantly, Wasson's interpretation would relieve a broker who has initial contact with the seller from liability for failing to investigate or disclose relevant information concerning the stock if he does not actually execute the sale. This interpretation would shield a broker from liability who failed to pass on material information acquired from the issuer or who completely neglected his responsibility to investigate the source and transferability of the stock. We believe such a result is completely inconsistent with the Act's disclosure aims and ignores the oftentimes crucial positioning of a broker to obtain necessary information from the seller.

▇▇▇ Under the circumstances of this case, we have no difficulty finding that Wasson "sold" or "offered to sell" the S & M securities. His involvement with the transaction at the initial stage was extensive. He followed the market quotations of S & M stock at Proman's request, opened an account for Davidson, arranged with Proman and Davidson to have the shares sold through the latter's account, consulted with Proman concerning the source of the stock and the nature of the transaction, learned from Davidson or Proman that Davidson did not own the shares, that the automobiles were for several persons other than

Davidson, and that the assignment of funds was designed to allow delivery of the vehicles before the settlement date. In essence, Wasson completely controlled the transaction until he disclosed some of his findings to his superiors at Walston and Company. We believe Wasson should be treated as a seller because of his extensive role in facilitating the sale because he was made aware of questionable circumstances surrounding the transaction which should have been investigated more fully and revealed in detail to his superiors, and because his position in the flow of information made his failure to fully investigate or disclose all the more serious.

### V. Whether Wasson's Conduct was Willful.

█ The Commission sanctioned Wasson under § 15(b) of the Securities Act of 1934 for *willfully* violating § 5 of the Act and *willfully* aiding and abetting the violation of that provision. Wasson challenges the finding that he acted willfully, claiming that his behavior in failing to make a sufficient inquiry and to advise his superiors of *all* relevant facts was merely negligent. Relying on *Ernst & Ernst v. Hochfelder, supra*, Wasson submits that willfulness as "a state of mind condition requires something more than negligence." *Id.* at n. 28. We agree that the concept of willfulness implies something more than mere negligence. However, neither the statute nor the relevant regulations defines the scope of that term. In negligence law, the words " 'willful,' 'wanton,' and 'reckless' are employed either singly or in combination to characterize conduct * * * more heinous or culpable than ordinary negligence." 57 Am.Jur.2nd, *Negligence*, § 101 at 451; Prosser, *Law of Torts*, 184 (4th Ed. 1971). In several securities' cases prosecuted under the willfulness standard of § 15, violations were found where the defendant proceeded in apparent disregard of or with reckless indifference to a known obligation or set of facts. In *Nees v. SEC*, 414 F.2d 211 (9th Cir. 1969), a salesman was sanctioned for selling unregistered securities; he defended on the ground that he had no obligation to investigate the validity of his employer's claim of exemption. The Court found a willful violation on the ground that the defendant was aware of facts which should have caused him to question the exemption claim. Similarly, in *Stead v. SEC*, 444 F.2d 713 (10th Cir. 1971), *cert. denied*, 404 U.S. 1059, 92 S.Ct. 739, 30 L.Ed.2d 746 (1972), the Court upheld a willfulness finding where the defendant consciously closed his eyes to suspicious facts which should have suggested the need for registration.

█ In our judgment, Wasson's conduct fits squarely within the holdings of those cases and the meaning commonly given to the willful or reckless standard. He was aware of several facts suggesting the suspicious nature of the transaction. With reckless indifference to those facts, he proceeded to facilitate the sale, ignoring the obvious need for further inquiry and his duty to disclose all relevant information to his superiors. Our construction of the term willful, in accordance with those of the other Circuits, allows no other interpretation of Wasson's behavior.

For the reasons stated above, we affirm the order of the Commission respecting the violations of § 5(a)(1) and § 5(c).