Owen V. KANE, Petitioner,

v.

The UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Respondent.

No. 87–1080.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1987.

Decided March 14, 1988.

W. Michael Drake, Edina, Minn., for petitioner.

Leslie E. Smith, Washington, D.C., for respondent.

Before ARNOLD, FAGG and BEAM, Circuit Judges.

BEAM, Circuit Judge.

Owen V. Kane appeals from an order of the Securities and Exchange Commission (the Commission) suspending him from association with any broker or dealer for a period of six months. This court has jurisdiction to review the Commission's order pursuant to section 25(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78y(a)(1). The Commission entered its order on November 20, 1986, with the suspension to become effective December 15, 1986. On December 3, 1986, the Commission stayed its sanction pending our review. Upon a review of the record, we affirm the Commission's order of suspension.

## Background

After investigation, the Division of Enforcement (the Division) of the Securities and Exchange Commission determined that Kane and his employer, A.G. Becker, Inc. (Becker) had willfully violated sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. § 77e(a) and (c).[1] Specifically, the

---

1. 15 U.S.C. § 77e:

    **Sale or delivery after sale of unregistered securities**

    (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

    (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

    (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

    \* \* \* \* \* \*

    (c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use

Division charged that between December 1981 and January 1982, Kane and Becker acquired and distributed 150,000 unregistered shares of the common stock of Grandma Lee's, Inc.

A hearing before an administrative law judge (ALJ) pursuant to 15 U.S.C. §§ 78o(b)(4) and 78d–1(a) was held in September of 1984. The hearing lasted three days and generated 500 pages of written record. At the conclusion of the proceeding, Becker and the Commission reached a settlement, with Becker accepting censure. On March 22, 1985, the ALJ issued his ruling and imposed upon Kane the sanction sought by the Division: a six-month suspension.

Kane asked for the Commission's discretionary review of the ALJ's order as provided by 15 U.S.C. § 78d–1(b). After hearing oral argument, the Commission affirmed the ALJ in all respects and issued its November 20, 1986 order suspending Kane from association with any broker or dealer for six months. It is this order from which Kane now appeals.

### Facts

Kane was a registered representative in Becker's Minneapolis office from July 1978 to August 1984. He had 15 years experience in the securities business at the time of the alleged violations.

Starting in June of 1980, Kane began to seek information about Grandma Lee's, a Canadian corporation that franchised sandwich shops with on-site baking facilities. His contact was Gordon Hanson. Hanson was the vice-president and assistant secretary of Grandma Lee's. During the next 18 months, the two spoke with each other on numerous occasions and Hanson sent Kane at least 14 different documents concerning the ownership, performance and future plans of Grandma Lee's.

Kane forwarded these documents to the Becker research department in New York. Kane hoped that Becker would eventually make a recommendation that its clients should buy Grandma Lee's stock (in industry parlance, "make a buy recommendation"). During this same period, Kane executed transactions in Grandma Lee's stock for two customers totaling at least 12,000 shares.

In May of 1981, Grandma Lee's completed a private placement of 300,000 Redeemable Convertible First Preferred Shares, Series C ("Series C shares"). Grandma Lee's had approximately 5.5 million shares of common stock outstanding. Nearly one-half of the 5.5 million shares were held in a five-year voting trust and were not available for sale.

In the spring and summer of 1981, two meetings were held between representatives of Grandma Lee's and Becker at Becker's New York headquarters. Both meetings were arranged by Kane. At one or both of these meetings, the parties discussed the type of investment banking services Becker could offer and whether Becker might carry an inventory of Grandma Lee's stock as a "market maker." Kane was present at the summer meeting.

Beginning in August of 1981, Kane began exploratory talks with a group of Minneapolis investors about opening up their own Grandma Lee's franchises in the United States. Kane was himself to be a joint venturer. By November of 1981, Kane was simultaneously: (a) pursuing a joint venture of his own with Grandma Lee's; (b) recommending Grandma Lee's stock to clients; and (c) pushing Becker to make a buy recommendation of Grandma Lee's stock.

Donald Trott, Becker's head of research, went to Canada around December 1, 1981, to inspect Grandma Lee's operation as a preparatory step to Becker issuing a buy recommendation. During Trott's visit, he told Hanson that 100,000 to 200,000 shares of stock ought to be made available to Becker in order that Becker could service the expected influx of orders that a buy recommendation would induce. Becker is-

or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refus-

al order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

sued its buy recommendation on December 7, 1981.

Several days later, Hanson called Trott. Hanson told Trott he had accumulated 150,000 shares of stock. Trott told Hanson to call James Volk, head of Becker's "over the counter" trading department. Hanson then did call Volk. Hanson told Volk that the shares required a minimum price of $12.00. At that point, Volk requested that the transaction be conducted through a bank. Hanson suggested the Toronto Dominion Bank.

On or about December 10, 1981, Hanson and Kane spoke by telephone. Kane informed Hanson that Kane would be handling the transaction. Thereafter, a discussion ensued concerning the source and ownership of the 150,000 shares. Just what was said during this discussion is a matter of some dispute.

The block of stock represented holdings of six owners. By Canal, SA (a corporation) owned 55,260 shares. By Canal obtained its common stock by converting Series C shares obtained through the Private Placement Offering that had occurred in the spring of 1981.

T.C. Gilks owned 21,052 of the 150,000 shares. He obtained his shares from his relative, Carole Rampling. Ms. Rampling, an assistant secretary of one of Grandma Lee's subsidiary corporations, had converted her Series C stock into the 21,052 shares of Grandma Lee's common.

William Hood owned 21,052 of the 150,000 shares. Hood was then president of Grandma Lee's. His stock was issued through the conversion of Series C shares. Hood Holdings Ltd., a corporation controlled by William Hood, similarly owned 21,052 of the 150,000 shares.

David Csumrik owned 10,532 of the 150,000 shares. He also converted Series C shares. Csumrik purchased his Series C shares from Allan Biggs, an original private placement offeree. Biggs was chairman of Grandma Lee's.

The sixth owner was Gordon Hanson, vice-president of Grandma Lee's. He owned 21,052 of the 150,000 shares. His shares represented purchases of Grandma Lee's common through his participation in a "key employee" stock purchase plan. It appears that all of the Series C conversions to common stock took place between December 1 and December 7, 1981.

As was routine for every client, Kane opened a trading account at Becker in order to facilitate the acquisition and distribution of the 150,000 shares. Kane filled out the actual account form on December 14, 1981—after transactions involving 75,000 shares had already been executed.

On the account form, Kane listed Jack Schneidell, an employee of the Toronto Dominion Bank, as the party who contacted Kane about opening the account. Kane listed the bank as being the client and sole operator of the account, and stated that it owned no unregistered stock and had no control relationship in a publicly owned company.

Contrary to that which Kane wrote on the account form, the account was operated by a party who had a control relationship with a publicly owned corporation and who owned unregistered shares: Gordon Hanson, vice president of Grandma Lee's. Had Kane filled out the form accurately, both his branch manager and the Becker legal department may have been prompted to give the transaction further scrutiny. Because the true nature of the account was concealed, the branch manager gave it his routine approval.

In carrying out the stock transactions, Hanson would call Kane on a given day and tell Kane how many shares were available to sell. Kane would then speak with Gregory Emmett, a senior trader at Becker, to discuss prices. Thereafter, Kane would call Hanson to tell him of the firm offers made by members of the general public. Agreement would be reached and a settlement date for payment by the purchaser would be established. Becker would then deliver payment to the bank in exchange for the shares. Presumably, Becker would then deliver the shares to the purchaser upon the purchaser's payment being made to Becker.

Sales by Kane occurred on December 10, 11, 17 and 18, 1981. On January 4, 1982, Becker cancelled and then reinstated these transactions. The paper work links these trades. Kane received a $7,000.00 commission for his part in the sale of the securities.

On February 12, 1982, Kane sent a letter to the chairman of Grandma Lee's asking to be paid $40,000 "for my activities in behalf of Grandma Lee's" in connection with Kane's proposed United States joint venture. In April of 1982, trading in Grandma Lee's shares was suspended. At the time of suspension, the stock was selling at $12.00 a share—roughly the price obtained by the six owners of the 150,000 shares. When trading reopened, the selling price was $3.00 per share.

**Commission's Findings**

The Commission found the following in determining that Kane had violated sections 5(a) and 5(c) of the Securities Act: (1) that the 150,000 shares in question were unregistered and not exempt from registration under sections 4(1) and 4(3); (2) that Kane was uniquely positioned to ask relevant questions, acquire material information, or disclose his findings; (3) that Kane failed to properly inquire as to the source of the 150,000 shares; (4) that Kane's violation was willful; and (5) that a six-month suspension was warranted as being in the public interest. Kane has questioned the adequacy of these findings. The question before us is whether there is substantial evidence to support the Commission's findings. *Feeney v. SEC*, 564 F.2d 260, 261 (8th Cir.1977); 15 U.S.C. § 78y(a)(4).

In reviewing the Commission's findings, we will proceed in the following manner: first, we will examine Kane's affirmative defense. Second, we will examine the extent of his duties with regard to these transactions. Third, we will analyze the standard of care imposed upon Kane by these duties, and whether he breached the

standard. Fourth, we will look to see whether his breach was willful.

**I. Exempt Transactions—Kane's Affirmative Defense**

Sections 4(1) and 4(3) of the Securities Act, 15 U.S.C. § 77d(1) and d(3) exempt certain transactions involving unregistered securities from the provisions of sections 5(a) and 5(c) of the Act. Kane's appeal does not contest the Commission's findings that the 150,000 shares were not exempt. Rather, Kane argues that he reasonably believed that the shares were exempt and, thus, he should not have been found to have violated sections 5(a) and 5(c).

■ Once the SEC introduced evidence that Kane had violated the registration provisions, however, Kane had the burden of showing that the shares were exempt. *See SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir.1980) (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953)). Kane offered no evidence to suggest that the shares were entitled to exemption. Thus, Kane actually offered nothing by way of a section 4(1) or 4(3) defense. The reasonableness of his belief that the shares were exempt is only relevant to the willfulness of his violation of section 5, and whether or not he properly discharged his obligations to inquire into the source of the shares.

**II. Uniquely Positioned—Duty**

■ Kane questions the Commission's finding that he was uniquely positioned to ask relevant questions, acquire material information, or disclose his findings. Under Kane's theory, the sale of the 150,000 shares to Becker was fully accomplished and completed at the time of the phone call between Hanson and Volk. Kane argues that the two agreed on a net price of $12.00 a share, and the number of shares to be sold, *i.e.*, 150,000 shares. Thus, according to Kane, he was a mere order taker.[2] Any

**2.** Kane's argument that he was a mere order taker of a completed transaction between Volk and Hanson is contradicted by the record. Shares sold on December 10, 1981, went for $12.25. Shares marketed on December 11, 1981, sold for $12.16 and $12.08. Shares sold December 17, 1981, sold for $12.06. Shares sold on December 18, 1981, traded for $12.15. These payments were treated as if the stock belonged to individual sellers. These figures,

information he may have obtained and revealed, he says, would have been to no avail. Moreover, Kane disclaims any involvement whatsoever in Becker's sale of the 150,000 shares to the general public. As such, Kane argues that he was in no way a participant for purposes of section 5 liability.

This circuit has determined that section 5 liability extends to those persons who are uniquely positioned to ask relevant questions, acquire material information, or disclose their findings. *Wasson v. SEC,* 558 F.2d 879, 886 (8th Cir.1977). Such liability encourages those parties who can most efficiently obtain information and disclose it, to do so, while not penalizing mere intermediaries who would not normally be expected to inquire or disclose. *See id.*

The record supports the Commission's findings that Kane was the type of person to whom liability extends. Kane's involvement at the initial stages was extensive. It was Kane who set up the trading account, who knew that Hanson would control the account, and who knew that the Toronto Dominion Bank was not the owner of the shares. It was Kane, exclusively, to whom Hanson would relay the size and price parameters for each separate transaction. Kane acted as a conduit between Emmett, who arranged sales of the shares to the general public, and Hanson. Finally, it was Kane's responsibility as a broker, both by Becker policy and industry custom, to properly inquire as to the source of the 150,000 shares. An entire infrastructure and bureaucracy existed at Becker to efficiently process and disseminate any information that Kane might disclose.

## III. Amount of Inquiry Called For—Standard of Care and Breach

■ The SEC has notified broker-dealers of their obligation to inquire when distributing unregistered securities:

[A] dealer who offers to sell, or is asked to sell a substantial amount of securities must take whatever steps are necessary to be sure that this is a transaction not involving an issuer, person in a control relationship with an issuer or an underwriter. For this purpose, it is not sufficient for him merely to accept "self-serving statements of his sellers * * * without reasonably exploring the possibility of contrary facts."

The amount of inquiry called for necessarily varies with the circumstances of particular cases. A dealer who is offered a modest amount of a widely traded security by a responsible customer, whose lack of relationship to the issuer is well known to him, may ordinarily proceed with considerable confidence. On the other hand, when a dealer is offered a substantial block of a little-known security either by persons who appear reluctant to disclose exactly where the securities came from, or where the surrounding circumstances raise a question as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for.

Distribution By Broker–Dealers of Unregistered Securities, Exchange Act Release No. 4445, 27 Fed.Reg. 1251 (1962) (Feb. 2, 1962) (footnote omitted) (quoting *SEC v. Culpepper,* 270 F.2d 241, 251 (2d Cir. 1959)).

Kane argues that he fully discharged his obligations under the standards set forth above, and therefore he did not violate sections 5(a) and 5(c). The Commission found that Kane did not make the required inquiry. This finding is supported by substantial evidence.

Kane gave an account of his inquiry. He testified that Hanson called to let him know that Hanson had a block of stock to sell. Kane asked who the sellers were. Hanson, according to Kane, replied that they were friends of the corporation. Kane then asked if any of the stock was being sold by officers, directors, insiders or control people. Hanson replied "no," that the sellers were friends of the corporation. Hanson then asked that the trades be han-

---

therefore, belie the claim that Becker had already purchased the shares before Kane and

Hanson began dealing in the specific transactions.

dled through the Toronto Dominion Bank. Kane agreed, and the transactions at issue began.[3]

Assuming that Kane's account is the true story of the December 10th phone call with Hanson, we find that there is, nevertheless, substantial evidence to support the Commission's finding that Kane failed to discharge his obligation to inquire.

The Commission found Kane's inquiry insufficient because: (a) Kane knew that Grandma Lee's was not registered with the SEC as of March 1981, and had no reason to believe that registration had occurred in the interim; (b) the 150,000 shares, which represented 5.4% of Grandma Lee's common stock available to trade, was a substantial block; and (c) Kane did not seek any objective opinion that the shares were tradeable, but rather, relied on the self-serving statements of the very corporate officer who was to act as the customer in the transaction.

It is clear that Kane believed that the shares were unregistered. In fact, he defended against the Commission's charges largely on a basis that he reasonably believed that the shares were exempt from registration requirements. Kane actually had sufficient information to cause him to believe that the shares were probably not exempt. He had received a draft of the Private Placement Memorandum for the Series C shares, and Grandma Lee's Annual Report for 1981.

The placement memorandum discussed the fact that 43% of Grandma Lee's common stock was held in a voting trust. The Report discussed the outcome of the Private Placement, *i.e.*, that it was subscribed to in large part by possible control persons. Due to Kane's reputation for thoroughness and the fact that he himself was a potential investor in Grandma Lee's, we assume he read these documents and knew that the 150,000 shares could, and very likely did, include a block of converted Series C shares which were nonexempt, unregistered securities. Under the circumstances, we think that Kane's reliance on the self-

serving statements of his seller without reasonably exploring the possibility of contrary facts demonstrates behavior that does not comply with the Act. *See Culpepper*, 270 F.2d at 251.

Finally, Kane filled out the account form on December 14, 1981. Seventy-five thousand shares had already been traded. By that date, Kane knew full well that Hanson was to function as the operator of the account—not persons from the Toronto Dominion Bank. We believe that Kane's own actions in making false statements on the account form and concealing from Becker's legal department and his branch manager all mention of Hanson's connection with the transaction strongly indicates that Kane actually was suspicious as to Hanson's statement, if actually made, that the shares came from "friends of the corporation." Further inquiry was required. *See Wasson*, 558 F.2d at 887.

## IV. Willfulness

■ The Commission found Kane's violation to be willful. In this circuit, willfulness can be found if a broker or dealer who is aware of several facts suggesting a suspicious transaction proceeds to facilitate the sale with reckless indifference to such facts, and ignores the obvious need for further inquiry and the duty to disclose all relevant information to his superiors. *Wasson*, 558 F.2d at 887; *see also Feeney*, 564 F.2d at 262.

In our judgment, Kane's conduct can easily be construed as being willful. Not only did he not inquire, despite the suspicious circumstances, but he concealed relevant information from his branch manager and the Becker legal department. It is significant that the requested information on the account form—name of operator and the nature of his holdings—is information that is routinely recorded on every account form. Given Kane's testimony that Hanson acted for all intents and purposes as the client on the account, Kane's deliberate concealment of that information could be

---

3. Hanson's own account was that Kane never asked whether the sellers were directors, offi-

cers, etc., and also, that Hanson told Kane that Hanson himself was one of the sellers.

determined to be a willful attempt to fend off further inquiry.

## V. Penalty

 The Commission suspended Kane for six months from association with any broker or dealer. The choice of sanctions may not be overturned unless we find it " 'unwarranted in law or * * * without justification in fact * * *.' " *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973) (quoting *American Power Co. v. SEC*, 329 U.S. 90, 112–13, 67 S.Ct. 133, 146, 91 L.Ed.2d 103 (1946)). The Commission's determination to impose a particular sanction upon a member of the securities industry will not be reversed unless shown to constitute a gross abuse of discretion. *Tager v. SEC*, 344 F.2d 5, 9 (2d Cir.1965).

While we might not have imposed as harsh a penalty, the record shows that it is justified. Four months after the violation, trading in Grandma Lee's was halted. The holders of the 150,000 unregistered shares were left with shares that plummeted from $12.00 a share before trading halted, to $3.00 a share upon the reopening of the market. Had Kane not violated section 5, it seems reasonable that at least some of these shares would not have been offered or purchased before trading was halted.

Finally, we cannot find an abuse of discretion. Whatever Kane's past record and community service, the evidence warrants the Commission's inferences from Kane's actions, and the penalty.

The order of the Commission is hereby affirmed.