# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3439

_____

|  |  |  |
|---|---|---|
| Christopher A. Lowry, | * | |
|  | * | |
| Appellant, | * | |
|  | * | Appeal from a Decision of the |
| v. | * | Securities and Exchange |
|  | * | Commission. |
| Securities and Exchange | * | |
| Commission, | * | |
|  | * | |
| Appellee. | * | |

_____

Submitted:  March 13, 2003

Filed:  August 12, 2003

_____

Before WOLLMAN, RICHARD S. ARNOLD, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

The Securities and Exchange Commission (Commission) sanctioned Christopher Lowry for failing to report to the Commission and inform investors of a personal loan his company made to him. Lowry appeals that decision. For the reasons stated herein, we affirm.

## I. *Facts*

Lowry, a registered investment advisor, owned and operated Lowry Investors Services, Inc., also known as "No-Load Advisors." In 1994, Lowry developed a

business idea to provide lower-priced investment advisory, educational, and administration services to 401(k) plans by aggregating smaller 401(k) plans. He named this new company "401(k) University,"[1] and Lowry, as CEO, designated himself "Dean of Students." Several of Lowry's existing clients invested in his new company. Lowry, however, failed to establish a separate bank account for 401(k) University and commingled the investment funds for 401(k) University in No-Load Advisors's bank account.

In 1999, Lowry intertwined his business and personal affairs. In order to accelerate acquisition of a home, Lowry used investors' funds to finance his home purchase. In August 1999, Lowry approached client Phillip Allen about extending a short-term loan to, or investing in, 401(k) University.[2] Lowry proposed that 401(k) University would pay Allen a fifteen-percent return for a six-month loan. For security, Lowry offered certain real estate. However, Lowry did not tell Allen that the real estate would be Lowry's future home and that he planned to use Allen's loan to finance it. Lowry wrote the loan agreement, included the security arrangements, and sent it to Allen.

Lowry further blurred distinctions between himself and his businesses by closing the home purchase with funds from No-Load Advisors's bank account derived from 401(k) University's stock sale. Lowry's plan to use the proceeds from the Allen

---

[1] 401(k) University is also known as Fountainhead Retirement Plan Services Inc.

[2] Allen, a No-Load Advisors client, was one of a several people Lowry had consulted regarding his plans for 401(k) University. Allen had told Lowry in the past that he and his father-in-law might be interested in becoming investors in 401(k) University and later indicated that he was willing to invest for shorter-time periods if needed. In May 1999, Lowry had no need for such arrangements. This need changed in August 1999 with Lowry's housing crisis, so Lowry sought a secured business loan from Allen.

loan to 401(k) University to close his home purchase fizzled because the closing date arrived before he acquired the loan proceeds from Allen. To document his withdrawal of funds from No-Load Advisors's account, Lowry executed a promissory note for $156,500 to be paid to "Fountainhead," also known as 401(k) University. However, Lowry did not disclose this transaction to either company's shareholders nor to the Commission. He claims he did not know disclosure was required.

Soon after Lowry closed the home purchase, the SEC investigated and intervened in the management of Lowry's companies. The Commission notified him that it planned to inspect the companies and, in December 1999, the Commission served Lowry with subpoenas for the production of documents and for his testimony. Lowry hired an attorney for the company. On February 15, 2000, the Commission obtained an ex parte order from federal district court freezing Lowry's and 401(k) University's assets. The Commission also placed a lien on Lowry's home. The Commission's intervention aborted Lowry's efforts to secure the Allen loan or a conventional loan for his home. The assets remained frozen for the next ten months. Following the entry of the order freezing the assets, Lowry hired a lawyer to represent him personally.

During the pendency of the investigation, Lowry maintained good communication and relations with his companies' investors. Lowry met with individual shareholders in the early months of 2000. He attended a shareholder's meeting in May 2000 and gave the shareholders copies of the Commission's complaint, the motion papers for the injunction, and his financial disclosure statements. He apologized to the shareholders for his failure to make full disclosures sooner. The shareholders continued to be separately represented by counsel, and they ratified the house loan to Lowry. Lowry later repaid the individual investors of 401(k) University pursuant to the agreement with the Commission. For the most part, the investors then reinvested the funds in the corporation.

The Commission pursued both judicial and administrative remedies against Lowry. The judicial proceedings against Lowry culminated with the district court's December 7, 2000, stipulated order. As part of the stipulation, Lowry neither admitted nor denied the allegations of the complaint, but agreed not to deny the allegations of the complaint. The court's order further enjoined Lowry from violating federal securities laws. On January 8, 2001, Lowry moved for an independent order for disgorgement, and the court entered that order on January 22, 2001. That order released the lien on Lowry's home, and he was able to obtain a mortgage.

A few weeks after the court's stipulated order, the Commission began an administrative proceeding to sanction Lowry. Following a hearing on April 17, 2001, a Commission Administrative Law Judge issued an initial decision on September 14, 2001, barring Lowry from associating with an investment adviser. Lowry petitioned the Commission for review, and the Commission issued its order affirming the decision on August 30, 2002. Lowry now appeals the Commission's decision, claiming that it is too harsh.

## II. *Discussion*

On appeal, Lowry raises three arguments. First, he argues that the sanctions the Commission imposed–particularly that of being barred from associating with an investment advisor–were unwarranted when applying the factors created by the Fifth Circuit in *Steadman v. SEC*, 603 F.2d 1126 (5th Cir. 1979). Second, Lowry argues that the sanctions are disproportionate to those assessed in other cases. Finally, Lowry argues that the Commission made factual errors and unsupported findings on which the sanctions were based.

## A. *Standard of Review*

The Commission's choice of sanctions is reviewed for a gross abuse of discretion. *Kane v. SEC*, 842 F.2d 194, 201 (8th Cir. 1988). The Commission's findings of fact must be affirmed if supported by substantial evidence. *Lowell H.*

*Listrom & Co. v. SEC*, 803 F.2d 938, 941 (8th Cir. 1986). This court gives conclusive effect to the factual finding of the Commission if those findings are supported by substantial evidence. *Stephen Investment Securities, Inc. v. SEC*, 27 F.3d 339, 341 (8th Cir. 1994). The choice of sanction may not be overturned unless we find it "'unwarranted in law or . . . without justification in fact . . . .'" *Kane*, 842 F.2d at 201 (quoting *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185–86 (1973); *see also American Power Co. v. SEC*, 329 U.S. 90, 112–13 (1946).

On judicial review, an agency's interpretation of its own regulations is entitled to substantial deference when the interpretation is consistent with the language of the authorizing statute and the purpose of the regulation. *Listrom*, 803 F.2d at 941; *see also United States v. Larionoff*, 431 U.S. 864, 872–873 (1977). The court's role is to decide only whether, under the applicable statute and the facts, the agency made "an allowable judgment in its choice of the remedy." *Steadman*, 603 F.2d at 1139 (quoting *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 612 (1946)). The *Steadman* court determined that "permanent exclusion from the industry is 'without justification in fact'" unless the Commission specifically articulates compelling reasons for such a sanction. *Id*. at 1140.

The underlying purposes of the securities laws include promoting disclosure of information, protecting the investing public, controlling fraud and manipulation in trading securities, and facilitating compliance. *Id.*; *SEC v. Southwest Coal & Energy Co.*, 624 F.2d 1312 (5th Cir. 1980).

B. *Steadman* Factors[3]

The Commission applied the six-factor analysis first outlined in *Steadman* to determine the appropriate sanction for Lowry's misconduct. The Commission's

---

[3] We have not formally adopted the *Steadman* factors for sanctions violations. However, the Commission used the factors as the basis for assessing sanctions, and Lowry does not object to their use.

analysis justified imposing the severe sanction of barring Lowry from associating with an investment advisor. Lowry argues that the Commission misapplied *Steadman*. We disagree. In *Steadman,* the Fifth Circuit remanded a matter to the Commission for further findings on a sanctions issue after determining that the Commission failed to provide sufficient analysis to support the sanction. The court noted that it had not reversed the Commission, but instead wanted to provide the Commission with the opportunity to justify its position. To facilitate the Commission's analysis, the Fifth Circuit provided factors[4] for the Commission to consider. These factors include (1) the egregiousness of the defendant's actions; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved; (4) the sincerity of the defendant's assurances against future violations; (5) the defendant's recognition of the wrongful nature of his conduct; (6) the likelihood that the defendant's occupation will present opportunities for future violations.[5]

### 1. *Egregiousness of Actions /Isolated Infraction/Degree of Scienter*

Lowry admits error, but he contends that his conduct reflected neither egregiousness nor the high degree of scienter usually indicative of investor fraud. He asserts that he repaid the funds to 401(k) University, the investors ratified his actions and supported him thereafter, and his actions were related to only one isolated transaction. He argues that there must be something more than a "bare" reporting violation to make an action egregious, and he asserts that he never had the intent to "defraud" any of the investors when he made the loan from the coffers of 401(k) University. Lowry attempts to palliate his actions by claiming that he could have paid himself a higher salary or repaid himself a loan he made to the No-Load Advisors.

---

[4] The factors used in *Steadman* for assessing sanctions also have been used in considering the propriety of an injunction. *See SEC v. Youmans*, 729 F.2d 413 (6th Cir. 1984)*; SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978).

[5] Lowry addresses each of these factors separately, but we combine the analysis of them. The Commission did likewise because of the similarity of some of the issues and arguments.

Lowry misreads *Steadman.* *Steadman* stands for the proposition that the sanction of complete bar should not apply in a case of isolated negligence on the part of an investment advisor. 603 F.2d at 1140. However, Lowry does not present such a case. The Commission found that Lowry committed substantially more than an isolated negligent act–rather, he committed a series of knowing acts. Lowry solicited investments before and after the "loan" without disclosing his intent and actions. Lowry attempted to conceal his conduct by failing to provide the promissory note to the Commission investigator in their initial audit and by his delay in telling the investors of the reason for the Commission's investigation. Lowry, at one point, admitted that he used the money to pull himself out of a "tight spot."

The time-line of events proves that Lowry intended to use 401(k) University's investor money, whether from the Allens' loan or from other investor stock sales, to pay for the house without giving notice to the investors in direct violation of securities laws. Furthermore, despite Lowry's claims that he believed that his actions were permitted and that he did not know these actions were a violation of law, he spent considerable effort to conceal exactly how he planned to use the Allens' and the other investors' funds. Finally, although he asserts that he planned to immediately repay the money, the facts show that by the time his accounts were "frozen" on February 15, 2000, Lowry had only spoken with a mortgage broker about obtaining a mortgage. In the three or four months after Lowry used 401(k) University's investor funds to buy his home, he reached no agreement with a mortgage lender.

Lowry's conduct meets the scienter requirement supporting the assessment of sanctions. In *Tager v. SEC*, the Second Circuit noted that, generally, "willfully" means "intentionally committing the act which constitutes the violation. There is no requirement that the actor also be aware that he is violating one of the Rules or Acts." 344 F.2d 5, 8 (2d Cir. 1965). Furthermore, although the *Steadman* court noted that scienter is a necessary element to consider when imposing sanctions, a finding of

recklessness suffices.[6] *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976) (suggesting reckless disregard for the truth may suffice as scienter in some circumstances); *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977) (noting recklessness is adequate for scienter). At the least, Lowry's use of 401(k) University's investor funds was reckless. It is clear that Lowry planned to use the funds for personal reasons without advising his investors or the Commission of the transaction. His actions evidence a "highly unreasonable omission" and "an extreme departure from the standards of ordinary care" that Lowry, as a seasoned investment advisor, knew or should have known would have misled the company's investors and the Commission. *Southwest Coal*, 624 F.2d at 1321 n. 17 (citation omitted).

### 2. *Sincerity of Assurances Against Future Violations/ Recognition of Wrongdoing*

Lowry next argues that there are no "magic words" he can use to convey his regret or assure the Commission that he would not violate securities laws again. He argues that proposed controls created by the stockholders guarantee that he could not misuse 401(k) University's funds again. Lowry argues that while he recognizes his wrongful conduct, the investors ratified his actions and continued to support him, he has no prior record of infractions, and his clients have made money rather than lose money with him at the company's helm.

---

[6] The Fifth Circuit in *Southwest Coal*, a violations case, described the degree of recklessness necessary to qualify as scienter as "'a highly unreasonable omission, involving not merely simple, or even unexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" 624 F.2d at 1321 n. 17 (quoting *Franke v. Midwestern Okla. Devel. Auth.*, 428 F. Supp. 719, 725 (W.D. Okl. 1976)).

These *Steadman* factors are, in large part, based on a credibility determination by the Administrative Law Judge. Lowry presents no convincing argument that the Commission's findings as to his sincerity should not stand. The facts reflect purposeful conduct on his part, and we will leave determination of his credibility as to his future actions and contrition for past actions to the finder of fact.

### 3. *Opportunities for Future Violations*

Finally, Lowry argues that protecting the investing public should be secondary to protecting the particular investors in this case. He asserts that if he is barred from providing investment advisory services through 401(k) University or No-Load Advisors, a primary goal of 401(k) University will be "unattainable." Lowry again notes that the investors ratified his actions in the May 2000 shareholder meeting and created protections that would prevent Lowry from having sole control over the funds in the corporate coffers. He argues that while the purpose of the securities law is to protect the investing public, the actual investors in the particular company are those who are most affected. And, he argues, these investors would be harmed by this sanction.

We reject Lowry's argument. A similar argument was asserted in *Tager*, wherein the defendant, who had his membership in the National Association of Securities Dealers revoked, argued that he had no history of previous violations, he cooperated with the Commission in that and other investigations, he caused no public investment losses due to his violations, and he was inexperienced. In considering these factors, the Second Circuit determined that "[w]hile these factors might have warranted a lighter sanction, they did not require one." 344 F.2d at 8. The Second Circuit reaffirmed this stance in *United States v. Brown*, 555 F.2d 336, 339 (2d Cir. 1977), wherein the defendant failed to persuade the court that a lack of actual "injury" to the investors should prevent a finding of criminality under the securities laws. *See also O'Leary v. SEC*, 424 F.2d 908 (D.C. Cir. 1970) (salesman barred from further participating in securities business although he was a first offender acting in accord

with advice of counsel and causing no injury to investing public). The Commission's assessment of sanctions reflects a reasonable application of the *Steadman* factors.

## II. *Disproportionate Treatment*

Lowry next asserts that the sanctions imposed on him were disproportionate to those in other cases. The United States Supreme Court addressed a similar issue in *Butz*, 411 U.S. 182.[7] In *Butz,* the defendant argued that the sanction of suspension was unreasonable, in part because it was more severe than sanctions imposed in similar cases. In response, the Court stated: "The employment of a sanction within the authority of an administrative agency is thus not rendered invalid in a particular case because it is more severe than sanctions imposed in other cases," and the unevenness in the application does not automatically render it "unwarranted in law." *Id.* at 187–188. Here, the Commission exhaustively analyzed Lowry's actions and determined that they warranted disbarment from association with an investment advisor. And, as the *Tager* and *O'Leary* opinions highlight, even first-time offenders can be assessed the most severe sanction of disbarment, and the facts in this case support such a sanction.

## III. *Factual Errors and Unsupported Findings*

Finally, Lowry argues that the Commission's findings that he did not intend to repay the money and that he "misappropriated" funds are not supported by the facts. He asserts that the promissory note and the notation of the transaction in the company books indicate that he did intend to repay the money. In addition, he argues that the money was not "misappropriated" because Minnesota law allows such a loan to be made, and the shareholders ratified the action. Finally, Lowry argues that if the minority stockholders had chosen to challenge the loan, they could have started a civil action to seek remedies for the improper corporate loan.

---

[7] While *Butz* involved an appeal from a decision by the Secretary of Agriculture rather than from the Commission, the standards for imposition of sanctions and review are the same.

The Commission responds that Lowry's claim that he planned to repay the "short-term" loan is not supported by the record because he failed for four months to reveal the promissory note to investigators and he did not legitimately attempt to seek another loan to repay the company as soon as possible. In addition, the Commission notes that most of these allegations were contained in the complaint filed in district court, and Lowry agreed not to dispute these findings.

Much of this point on appeal is addressed in previous arguments. However, we note that Lowry's claim that the stockholders had civil remedies they could pursue is similar to an argument rejected by the Second Circuit in *Brown*, 555 F.2d at 339. In that case, the defendant argued that he did not defraud investors because they had a civil remedy to replace stock the defendant converted by counterfeit and forgery in violation of the law. The court stated, "One might as well argue that if Brown stole Smith's fully insured automobile, he was never the victim of a larceny." *Id.* at 339. This alternative-recovery theory might well provide monetary relief for the investor, but it does not protect the investor or others from future violations. Only sanctions for statutory violations will achieve that end. The Commission did not abuse its discretion by barring Lowry from affiliating with an investment advisor.

We affirm the Commission's decision.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-11-